UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL RAY VILLICANA, JR.,

Petitioner,

v.

BLAINE LAFLER,

Respondent.

Hon. Wendell A. Miles

Case No. 1:06-CV-96

___________________________________/

## REPORT AND RECOMMENDATION

This matter is before the Court on Villicana's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Villicana's petition be **denied**.

## BACKGROUND

As a result of having allegedly engaged in unlawful sexual activity with his daughter, Petitioner was charged with three counts of first degree criminal sexual conduct and one count of second degree criminal sexual conduct. Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Laura Schneider**

As of August 28, 2002, Schneider was employed as a children's protective services worker with the Allegan County Family Independence Agency. (Trial Transcript, Dec. 8, 2003, 94-96). After receiving information that J.V. may have been neglected or abused, Schneider interviewed J.V. on August 28, 2002. (Tr. 95-96). Schneider interviewed J.V. privately at the school that she then attended. (Tr. 96-97). During this interview, J.V. was "very emotional, very distraught" and "somewhat embarrassed." (Tr. 102). The disclosures that J.V. made during this interview caused Schneider to become "very concerned." (Tr. 97-100). At the conclusion of this interview, Schneider successfully moved for a "pick up order" which authorized the Family Independence Agency to take J.V. into protective custody. (Tr. 101-11).

**Christine Davis**

Christine Davis and her husband, Preston Davis, began socializing with Petitioner and his family in approximately 1997. (Trial Transcript, Dec. 8, 2003, 115-16). The two families spent "a lot of time" at Petitioner's residence. (Tr. 116-17). As a result, Christine Davis was "pretty familiar. . .with the lay out of the Villicana house." (Tr. 117).

Davis testified that J.V. had her own bedroom upstairs. (Tr. 131). J.V.'s bedroom was located over the kitchen. (Tr. 136). J.V.'s two brothers shared a bedroom which was located over Petitioner's bedroom. (Tr. 131). The boys' bedroom had a vent in the floor through which it was possible to hear when the boys were "fighting or screaming or yelling." (Tr. 135). J.V.'s bedroom had no such vent, thus when the boys were in J.V.'s bedroom "doing stuff you couldn't hear anything." (Tr. 135). Petitioner's house contained a single bathroom. (Tr. 131). Petitioner

owned a "big screen" television which was "usually" turned up "pretty loud." (Tr. 134). Davis testified that given the location and layout of the bathroom when the television was on, "if anybody was [in the bathroom] calling for help you wouldn't hear them." (Tr. 131-34).

When asked whether she ever observed Petitioner act inappropriately around J.V., Davis related two incidents. (Tr. 118-19). One evening, in the summer of 2002, J.V. approached Petitioner before going to bed. (Tr. 118). Petitioner, who was sitting at the time, "put his arms around" his daughter and "rubbed his face in her chest, and looked over at [Davis] and smiled." (Tr. 118). Davis observed Petitioner engage in this behavior four or five times. (Tr. 119, 139). Davis also related another incident in which Petitioner patted his daughter "on the ass" as she "was going through the room." (Tr. 119).

On the weekend of August 23-25, 2002, Davis and her family went camping with Petitioner and his family. (Tr. 120-26). That Saturday, J.V. approached Davis and asked to speak with her in private. (Tr. 120-22, 139). Davis agreed and J.V. related "some things" to her. (Tr. 122). In response, Davis advised J.V. that she should speak with her "school counselors" because they would be better able to help her. (Tr. 122-23). J.V. then asked Davis if she could stay at her house for "a couple of nights" because "she felt uncomfortable being at the camp site with her father drinking, because when he was drinking so much something might happen." (Tr. 125-26). Davis agreed and J.V. stayed with Davis the rest of the weekend. (Tr. 126, 139).

**Chris Koster**

As of August 2002, Koster was employed as a detective with the Allegan County Sheriff's Department. (Trial Transcript, Dec. 8, 2003, 149, 152). After viewing a videotape of J.V.s

interview with Laura Schneider, Detective Koster interviewed Petitioner. (Tr. 151-53).

When questioned about J.V.'s allegations, Petitioner responded that "the reason he felt that his daughter [J.V.] was saying these things was because he was grounding her and not allowing her to see her boyfriends and therefore she was upset with that in not being able to get out of the house and do whatever she wanted to." (Tr. 156). Petitioner also claimed that on one occasion his daughter entered the bathroom "while he was urinating and had grabbed his penis." (Tr. 156-57). Petitioner further claimed that on another occasion his daughter "leaned over while he was driving and grabbed his penis." (Tr. 157). Petitioner admitted that he had not sought counseling for J.V. as a result of these alleged incidents. (Tr. 157). During this interview, Petitioner appeared "very agitated, nervous, [and] uncomfortable." (Tr. 158).

**Dr. Nancy Simms**

Dr. Simms examined J.V. on September 5, 2002. (Trial Transcript, Dec. 9, 2003, 7). J.V. was fourteen years of age as of the date of this examination. (Tr. 12). An examination of J.V.'s vagina and buttocks revealed redness, which the doctor characterized as "non-specific" findings that "are not findings that are specific to child abuse." (Tr. 19-20). Dr. Simms testified that because (1) J.V. was sexually mature and (2) a significant period of time had passed since the alleged events in question, the lack of serious injury "was not inconsistent with" J.V.'s allegations. (Tr. 20-24).

**J.V.**

J.V. testified that when she was "about 9 or 10" years old her father began making her "suck his penis" and "jack him off." (Trial Transcript, Dec. 9, 2003, 44-46). This behavior

continued until "maybe a week or two" before J.V. was taken into protective custody. (Tr. 47, 55-60). J.V. also related multiple incidents in which Petitioner attempted to engage in anal sex with her. (Tr. 49-55). J.V. testified that Petitioner had vaginal sex with her on one occasion. (Tr. 60-69). J.V. testified that Petitioner also digitally penetrated her on several occasions and "whenever it was time to go to bed" Petitioner would "put his head in [her] boobs." (Tr. 69-72). J.V. also testified that her father "never" grounded her. (Tr. 44).

J.V. testified that after reporting what her father had done to her that Ashley Brown began to harass her. (Tr. 77-78). Brown later wrote a note to J.V. that made her upset. (Tr. 79). After J.V. showed the note to her foster parents, Ashley Brown was no longer permitted to "come around the foster home." (Tr. 79).

**Michael Villicana, Sr.**

Petitioner's father testified that he never observed any behavior that caused him to be concerned that Petitioner was engaging in any kind of inappropriate or sexual activity with J.V. (Trial Transcript, Dec. 9, 2003, 95-97). Villicana testified that when J.V. was taken into protective custody, J.V. told him that she "done something [she] shouldn't have." (Tr. 95-98). Villicana testified that he was unsure what J.V. meant by this comment. (Tr. 100).

**Janice Villicana**

Petitioner's mother testified that she never observed any behavior that caused her to suspect that Petitioner was sexually abusing her granddaughter. (Trial Transcript, Dec. 9, 2003, 102-03). Villicana testified that when J.V. was taken into protective custody, J.V. told her that "she'd

done something terrible." (Tr. 104).

**Jason Johnson**

Johnson testified that he had known Petitioner for "probably 4 or 5 years," during which time he stayed at Petitioner's residence "on and off." (Trial Transcript, Dec. 9, 2003, 106-07). During the times he stayed at Petitioner's house he never witnessed anything that lead him to believe that Petitioner was sexually abusing his daughter. (Tr. 107-08).

**Jennie Sisson**

Sisson testified that she has known Petitioner "all [her] life" and often visited Petitioner's residence. (Trial Transcript, Dec. 9, 2003, 113-14). Sisson never witnessed any inappropriate activity between Petitioner and J.V. (Tr. 115).

**Ashley Brown**

Brown knew J.V. through her mother, who knew Petitioner. (Trial Transcript, Dec. 9, 2003, 118). Before J.V. was taken into protective custody, Brown and J.V. were friends. (Tr. 119). Brown testified that after making the allegations of sexual abuse against her father, J.V. told her that "it was all a lie and she didn't want to be there because she had to do her chores, and she didn't want to clean the house and she was grounded to her yard." (Tr. 119). Brown and J.V. later "had a falling out" and were no longer friends. (Tr. 119-20).

**Matt Vernon**

Vernon testified that he was "good friends" with Petitioner and used to attend school with J.V. (Trial Transcript, Dec. 10, 2003, 6-7, 12). Vernon testified that J.V. admitted to him that the allegations of sexual abuse she made against her father were untrue. (Tr. 8). According to Vernon, J.V. made these false allegations against Petitioner because she wanted to live with Preston and Christine Davis. (Tr. 8-9).

**Michael Villicana, Jr.**

Petitioner testified that he did not sexually assault his daughter. (Trial Transcript, Dec. 10, 2003, 31). Petitioner testified that prior to J.V.s allegations of sexual abuse, he was experiencing disciplinary problems with J.V. (Tr. 31-32). According to Petitioner, his daughter "was always taking off" on her bicycle and "was sneaking out of the house at night." (Tr. 32-34). Petitioner also testified that J.V. had "got caught stealing from school." (Tr. 32-33). In response to his daughter's behavior, he grounded her to the yard and prohibited her from spending time with one of her friends. (Tr. 32-34).

Following a jury trial, Petitioner was convicted of three counts of first degree criminal sexual conduct and one count of second degree criminal sexual conduct. (Trial Transcript, Dec. 11, 2003, 3-4). Petitioner was sentenced as an habitual offender to serve concurrent sentences of 14-40 years for each of the first degree criminal sexual conduct convictions and 10 to 22.5 years for the second degree criminal sexual conduct conviction. (Sentencing Transcript, Jan. 30, 2004, 12-13). Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claim:

I. The trial judge denied Michael Villicana his state and federal right to confront and cross-examine the witnesses against him by refusing to allow him to question the complainant about a specific incident of untruthfulness - her false claim to classmates that she was pregnant.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Villicana*, 2005 WL 2291705 (Mich. Ct. App., Sept. 20, 2005). Asserting the same claim, Petitioner then moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Villicana*, 707 N.W.2d 206 (Mich., Dec. 27, 2005). On February 6, 2006, Petitioner submitted the present petition for writ of habeas corpus in which he asserts the same claim identified above.

## STANDARD OF REVIEW

Villicana's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively*

unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

## ANALYSIS

At the outset of trial, before jury selection, the prosecution moved to prevent Petitioner from questioning J.V. about certain statements she allegedly made. The trial court granted the prosecutor's motion. Petitioner asserts that the trial judge's ruling deprived him of his Sixth Amendment right to confront the witnesses against him. The entire exchange between the

prosecutor, Petitioner's counsel, and the trial court is as follows:

The Court: Alright, there's a motion filed by the prosecutor I believe.

Prosecutor: Yes, your Honor.

The Court: Let's proceed with it.

Ms. Pratt: Your Honor I did file a motion in limine. My understanding in speaking to Mr. McEwen last week was that he wanted to be able to bring up an incident that occurred back in 2001. The referral date to FIA was 2-26-01 wherein allegedly [J.V.], the victim in this case had told some classmates that she was pregnant and she was - - well, she didn't say she had sex, she just said that she was pregnant and her boyfriend was 20 years old. Apparently these kids got concerned and went to the school counselor, a Mr. Francisco, and [J.V.] talked to Mr. Francisco then to Don Mead of the FIA and I think Don Mead also talked to Mr. and Mrs. Villicana regarding this incident.

I think Mr. McEwen would like to bring it up to show that [J.V.] lied about being pregnant which obviously would lead one to believe that she had to have sex. If you take a look at the report it doesn't say that [J.V.] lied, it says that [J.V.] said those must be rumors, my girlfriends and I talk, I'm not pregnant, I'm a virgin, I've broke up with my boyfriend, those are just things that we girls talk about at school, we were all talking about sex and being pregnant.

I spoke to Mr. Francisco who is willing to testify, and I also spoke to Don Mead from the FIA; both told me that it wasn't an issue of whether or not [J.V.] lied, it was an issue that some girls came to a counselor at school and that it turned out to be rumor. Mr. Francisco said that he certainly felt obligated to turn it over to FIA. He had had some concerns about [J.V.] for quite awhile and about her family, and so knowing the family history he felt that he should call FIA. FIA said that after they investigated it they not only found that [J.V.] wasn't pregnant, but there wasn't enough to substantiate on the family for any sort of neglect.

So, to me that goes back to the issue of whether or not this is being brought up to show some promiscuity on [J.V.'s] part,

that is not admissible under the Rape Shield Statute so I would ask the court to exclude this evidence.

Mr. McEwen: Your Honor I would disagree with the prosecuting attorney's statement that there's an implication that the child had sex just because the child may have told a story in the past. We would maintain that the purpose of allowing Mr. Villicana to testify to this is to illustrate to the jury that in the past [J.V.] has made some very serious misrepresentations regarding serious issues.

They quote in here from [J.V.] that it's just a rumor and that she, referring to [J.V.], talks to other kids and that they just talk about being pregnant. I think that the prosecuting attorney will argue that this is such a serious matter that [J.V.] wouldn't lie about such serious things, that why would she come in here and say these things about her father or others and have to go through this proceeding because of the embarrassing nature of the allegations, and I think that this information is important to rebut that argument on the part of the prosecuting attorney. It's not being presented to show any kind of sexual promiscuity, in fact if the FIA had thought that she was sexually active they would have done something more than simply closed their report. As to show that she has a tendency to tell stories of a serious nature, and I think it's important for the jury to hear.

The Court: Well, there's two ways we can look at this. If I look at it from a standpoint that it involved alleged sexual behavior it's precluded by the Rape Shield Statute. If on the other hand I look at it as the defense would argue, then I'm going to have to have a trial. I'm going to have to try the issue of A: did she say it; B: under what circumstances did she say it. Probative is very little in terms of truth and veracity, you're talking about fifth grade kids running their mouth, and she didn't specifically allege any specific person. She denied - - in fact to a certain extent she denies, as far as the report goes, that she even said it. All the problems attendant with this type of evidence makes it unreliable, number one. Makes it burdensome to the court to even get into the issue because we're going to have to have several witnesses to deal with when did it happen, how did it happen, what was said. It would become a ridiculous affray for this court to get into that

type of evidence. It certainly is not probative of anything. It probably is irrelevant. It probably falls under the Rape Shield Statute, but certainly falls under 402. It's evidence which is of such little value and such heavy burden of the court to allow it in that the court will automatically say that it's not admissible.

Anything further?

Ms. Pratt: No, sir.

Mr. McEwen: No, your Honor.

The Court: Alright, let's bring in the jury.

(Trial Transcript, Dec. 8, 2003, 3-6).

The Confrontation Clause of the Sixth Amendment, applied to the states through the Fourteenth Amendment, *see Pointer v. Texas*, 380 U.S. 400, 403-05 (1965), guarantees to every criminal defendant the right "to be confronted with the witnesses against him." *Cruz v. New York*, 481 U.S. 186, 189 (1987). This right entitles the accused to see the witnesses against him face-to-face, and to hear their testimony. *See Dowdell v. United States*, 221 U.S. 325, 329-30 (1911) (adequate confrontation requires that the accused have the opportunity to see the witnesses against him face-to-face at trial). The Confrontation Clause insures that each witness "will give his statements under oath - thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury." *Lee v. Illinois*, 476 U.S. 530, 540 (1986) (citation omitted). The Confrontation Clause also permits the jury to observe the witnesses, enabling them to judge by their demeanor on the stand whether they are worthy of belief. *See Mattox v. United States*, 156 U.S. 237, 242-43 (1895).

The "main and essential purpose" of the Confrontation Clause, however, is "to secure

for the opponent the opportunity of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (citation omitted). The importance of the right to cross-examine adverse witnesses cannot be overstated. As is well recognized, cross-examination is the "greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970) (citation omitted); *see also*, *Van Arsdall*, 475 U.S. at 678-79 ("the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination").

The importance of the Confrontation Clause notwithstanding, it does not preclude the imposition of reasonable limits on a defendant's ability to question a witness as to her bias or veracity. *See Van Arsdall*, 475 U.S. at 679. As is well recognized, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.*; *see also*, *Holmes v. South Carolina*, 547 U.S. 319, 324-27 (2006) (same). As the Sixth Circuit has also observed:

> But the Supreme Court has made it perfectly clear that the right to present a "complete" defense is not an unlimited right to ride roughshod over reasonable evidentiary restrictions. A defendant "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. Rather, she "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."
>
> * * *
>
> A defendant's right to present a "complete" defense, in other words, does not automatically trump state evidentiary rules.

*Rockwell v. Yukins*, 341 F.3d 507, 512-13 (6th Cir. 2003) (internal citations omitted).

Where a defendant's ability to cross-examine a witness has been *limited* rather than prevented outright, as is the case presently, the Court must determine "whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory." *Stewart v. Wolfenbarger*, 468 F.3d 338, 347 (6th Cir. 2006) (citation omitted). In this respect, "the bounds of the trial court's discretion are exceeded when the defense is not allowed to place before the jury *facts* from which bias, prejudice or lack of credibility of a prosecution witness might be inferred." *Id.* (citation omitted). On the other hand, a defendant's confrontation clause rights are not violated "where cross-examination of a key government witness was only partially limited and where the questioning that was barred was not aimed at eliciting any additional facts." *Id.* (citation omitted).

Petitioner asserts that the incident about which he sought to question his daughter was relevant to demonstrate that she "had on another occasion told a whopping lie about an extremely serious matter." As the exchange quoted above reveals, however, there was no *evidence* that J.V. had lied about being pregnant. Instead, an investigation concluded that J.V. never made any such statements and, furthermore, that the matter was premised upon rumors. Petitioner was unable to present to the trial court any *facts* or *evidence* indicating that J.V. ever made the statements in question. Petitioner has likewise failed to present any such evidence to this Court.

Petitioner was freely permitted to cross-examine J.V. at length about the substance of her testimony and allegations, thereby enabling the jury to evaluate Petitioner's claim that J.V. was not testifying truthfully. Petitioner nonetheless asserts that his Confrontation Clause rights were violated by the trial court's refusal to allow him to question the victim about a matter that the trial

court reasonably concluded was inadmissible. Petitioner was not prevented from presenting to the jury any *facts* concerning potential witness bias, prejudice or lack of credibility, but was instead merely prevented from presenting to the jury unfounded rumor. The Court fails to discern how such violates Petitioner's Confrontation Clause rights.

The Michigan Court of Appeals concluded that Petitioner's Confrontation Clause rights were not violated by the trial court's evidentiary ruling. *People v. Villicana*, 2005 WL 2291705 (Mich. Ct. App., Sept. 20, 2005). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Villicana's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure

to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: January 7, 2009

/s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge